**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**CHATTANOOGA**

| | | |
|---|---|---|
| EDWIN DAVID CONGDON, | § | |
| | § | |
| *Plaintiff*, | § | No. ____________________ |
| | § | |
| ~v~ | § | |
| | § | **JURY DEMANDED** |
| GRUNDY COUNTY GOVERNMENT, | § | |
| | § | |
| DAVID ANDREW YOUNG, and | § | |
| | § | |
| HARLEY HOLT, | § | |
| | § | |
| *Defendants*. | § | |

"I tried to be gentle with you at first but you make me want to fight somebody!"

[Defendant David Andrew Young's recorded comments to Plaintiff]

**COMPLAINT**

PLAINTIFF, EDWIN DAVID CONGDON ("Plaintiff"), by and through his attorney, Robin Ruben Flores, and complaining of Defendants, GRUNDY COUNTY GOVERNMENT ("County" or "Grundy County"), DAVID ANDREW YOUNG ("Young"), and HARLEY HOLT ("Holt"), states as follows:

**INTRODUCTION**

1. This is an action to seek redress for violations of rights secured to the Plaintiff under the United States Constitution arising from the misconduct of Young, Holt, and Grundy County.

2. This civil rights action is brought under 42 U.S.C. §1983 against Young, and Holt in their individual capacities and against the County[1].

3. This action seeks damages against all Defendants caused by the violation of Plaintiff's constitutional rights as set forth more fully *infra*.

4. This action also raises state law claims against Young, Holt, and the County. Additionally, Plaintiff brings these claims against the County pursuant to TENN. CODE ANN. § 8-8-302 (as noted in ¶ 5, *infra*).

5. Plaintiff seeks compensatory, nominal, and punitive damages against Young and Holt in their individual capacities, and Plaintiff seeks for the County to indemnify Young and Holt under TENN. CODE ANN. § 8-8-302 and for the County to pay compensatory and nominal damages under 42 U.S.C. §1983.

## **JURISDICTION AND VENUE**

6. Plaintiff's claims for relief are predicated upon 42 U.S.C. §1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges, and immunities secured to the Plaintiff by the United States Constitution. This action arises under the Fourth, and Fourteenth Amendments to the United States Constitution. Thus, as to the § 1983 claims, this Court is vested with original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

7. This Court is vested with supplemental jurisdiction over Plaintiff's state claims pursuant to 28 U.S.C. § 1367 in that all claims set forth herein arise from the same case and controversies.

[1] Collectively, "Defendants."

8. Venue is proper in this Court, Chattanooga Division, pursuant to 28 U.S.C. §1391(B). All acts complained about occurred within Marion County, a political sub-division of the State of Tennessee physically located within the geographical district of this Court.

## THE PARTIES

9. Plaintiff is a United States citizen and a resident of Tennessee.

10. The County is a political sub-division of the State of Tennessee and formed under the laws of the State of Tennessee.

11. At all relevant times, the County employed Young and Holt as law enforcement deputy sheriffs, and at all relevant times they acted under color law.

12. At all relevant times, the County was responsible for the funding, maintenance, and supervision of the Grundy County Sheriff's Office ("GCSO" or "Sheriff's Office"), which is a law enforcement agency created under Tennessee state law and regulated by the laws of the State of Tennessee as to the hiring, training, retention, certification, and discipline of its law enforcement employees.

13. At all relevant times, the County was under a lawful obligation to not hire and retain people as law enforcement officers with histories of violence and official misconduct. Additionally, the County was under a lawful obligation to train its law enforcement employees in the use of force; under a lawful obligation to supervise and discipline its law enforcement employees, and under a lawful obligation to fully and thoroughly investigate the background of applicants prior to hiring them as law enforcement deputies/officers.

14. At all relevant times, Young was responsible for the safety and welfare of the Plaintiff; was under a lawful obligation to refrain from violating the Plaintiff's constitutional rights; was under a lawful obligation to refrain from the infliction of emotional distress upon the Plaintiff; and was under a lawful obligation not to assault and batter the Plaintiff.

15. At all relevant times, Holt was responsible for the safety and welfare of the Plaintiff; was under a lawful obligation to refrain from violating the Plaintiff's constitutional rights; was under a lawful obligation to refrain from the infliction of emotional distress upon the Plaintiff; was under a lawful obligation to intervene and prevent Young from violating Plaintiff's rights and from harming Plaintiff; and under a lawful obligation to report Young's misconduct to Grundy County supervisory personnel.

16. Plaintiff sues Young and Holt in their individual capacities and sues the County.

## FACTS-MONELL AND CANTON LIABILITY

### A. Grundy County's Hiring and Retention of Deputy Shawn Norris

17. The GCSO hired Shawn Phillip Norris ("Norris") and employed him as a sworn deputy sheriff, eventually holding the rank of Sergeant. Based upon information and belief, Norris also worked as a school resource officer ("SRO") with direct access to minors.

18. At the time of his hire, Norris carried an extensive, documented history of violent and predatory criminal conduct *spanning two decades* and

multiple jurisdictions. In 2002, Norris was found guilty in Kentucky of stalking on April 15, 2002, and of harassing communication on April 19, 2002. This fact was easily obtainable by Grundy County officials prior to hiring Norris.

19. In August 2011, while employed as a deputy with the Ware County, Georgia Sheriff's Office, Norris hid inside the garage of a Waycross Police Department officer with whom he had been involved, startled her and her companions by yelling "gotcha," and then physically fought her for control of her vehicle. This fact was easily obtainable by Grundy County officials prior to hiring Norris.

20. Norris was arrested on August 12, 2011 by the Waycross Police Department and charged with stalking and criminal trespass. This fact was easily obtainable by Grundy County officials prior to hiring Norris.

21. In October 2011, Norris was again arrested and charged with aggravated stalking — the victim having obtained an order of protection against him — and with willful obstruction of law enforcement officers. This fact was easily obtainable by Grundy County officials prior to hiring Norris.

22. In 2018, Norris, While working as a Walker County deputy sheriff, was indicted by the Georgia Bureau of Investigation, together with another Walker County deputy, on felony charges of aggravated assault, rape, and false imprisonment, arising from an arrest by the Catoosa County Sheriff's Office on June 16, 2018. Those charges were dismissed on October 2, 2019. This fact was easily obtainable by Grundy County officials prior to hiring Norris.

23. Rather than revoking Norris's peace-officer certification, the Georgia POST Commission placed him on 36 months' probation and required him to complete a domestic violence class. This fact was easily obtainable by Grundy County officials prior to hiring Norris.

24. Norris had previously been terminated by the Walker County, Georgia Sheriff's Office after that agency found that he failed to disclose a prior arrest and violated its conduct and ethics policies, and sustained the general allegation of violation of law against him. This fact was easily obtainable by Grundy County officials prior to hiring Norris.

25. The County's own subsequent internal affairs investigation concluded that Norris had used deception to obtain employment and was "completely unsuitable for law enforcement," finding that "[i]f Shawn Norris had not lied about his past, he would have never been hired by this agency." But such an epiphany does not explain the lack of any meaningful background investigation that would have easily revealed these facts to Grundy County officials prior to hiring Norris.

26. The Grundy County employment application Norris completed did not ask whether an applicant had ever been convicted of a felony, misdemeanor, or any crime.

27. The application did ask whether the applicant had ever been terminated or asked to leave a place of employment; Norris checked "No," a statement Grundy County *later* determined to be false given his termination from the Walker County Sheriff's Office.

28. Norris also omitted multiple prior law-enforcement employers from both his Grundy County application and his Tennessee POST certification application; the investigating detective concluded that the discrepancies "depict a pattern of deception." Yet, this fact was easily obtainable by Grundy County officials prior to hiring Norris.

29. Because of his criminal history, Norris was determined to be a witness who could never testify in a criminal proceeding: a District Attorney investigator advised that an officer with Norris's history would not be allowed to testify due to a lack of credibility, and a prosecutor's memorandum identified the Brady Rule as "a huge problem," reporting that Norris "can never be used as a witness in a criminal case." This fact was easily obtainable by Grundy County officials prior to hiring Norris.

30. Despite this history, and without fully investigating Norris's background despite having the ability as a governmental entity to obtain the information, the County hired Norris, armed him, placed him on patrol, and permitted him to serve in the community in a sworn capacity until the issues surrounding him were surfaced from **outside** the GCSO.

31. The GCSO did not open an internal investigation into Norris until after a July 21, 2023 Tennessee POST Commission meeting publicly presented findings concerning him; only then, on July 24, 2023, was Norris placed under internal investigation and suspended.

32. The internal affairs investigation recommended that the allegations against Norris be sustained and that he be terminated. Norris resigned from the GCSO on August 8, 2023, without submitting a resignation letter.

**B. The POST Commission Audit and Grundy County's Use of Non-Certified Deputies as School Resource Officers.**

33. Concerns regarding the GCSO use of non-certified deputies as school resource officers were raised and pursued by persons and institutions outside the GCSO. The concerns involved Norris and Deputy John Treavor Dykes.

34. The matter arose from an ongoing dispute between Grundy County Sheriff Heath Gunter and school director Clint Durley over the staffing of School Resource Officers in the county's schools.

35. A Tennessee POST Commission audit revealed "deficiencies" within the Grundy County Sheriff's Office, including untruthfulness, untrained deputies working alone as School Resource Officers, and unlocked school doors.

> [a]. Indeed, the POST Commission held hearings after investigations by the POST Commission determined that the GCSO employed unlicensed, untrained, uncertified deputies and that some deputies were on Brady/Giglio lists.

36. The audit reported that a non-certified deputy, John Trevor Dykes, was working school traffic by himself at Tracy City Elementary School, and that another non-certified officer was working solo as a School Resource Officer. School staff reported they had not had a School Resource Officer "all year."

37. The audit further reported that on April 16, 2023, Norris lied over the radio to initiate a vehicle pursuit, and that the non-certified Deputy Dykes assisted in that pursuit.

38. The State POST Commission voted to summon (now former) Sheriff Heath Gunter to appear before the board and to consider requesting that the Attorney General's office de-certify the Grundy County Sheriff's Office. In fact, former Sheriff Gunter testified in a POST Commission hearing (August 18, 2023) that he indeed used uncertified and untrained deputies on patrols citing staffing shortages after 23 employees resigned upon his election to office.

**C. Grundy County's Deputies Anthony Glenn Bean and Anthony Doyle Franklin Bean and Their Federal Civil Rights Prosecution.**

39. Anthony Glenn Bean served in the Grundy County Sheriff's Office for years, including as its Chief Deputy and as its Training Officer, and also served as Chief of the Tracy City Police Department.

40. Anthony Doyle Franklin Bean likewise served as a Grundy County deputy and, by 2018, held the rank of Sergeant, supervising the night shift.

41. On July 24, 2019, a federal grand jury in the United States District Court for the Eastern District of Tennessee at Winchester returned an indictment charging both Anthony Glenn Bean and Anthony Doyle Franklin Bean with deprivation of rights under color of law, in violation of 18 U.S.C. § 242.

42. The indictment charged that on or about December 30, 2017, Anthony Glenn Bean, acting under color of law as Chief Deputy of the Grundy County

Sheriff's Office, assaulted arrestee F.M. and willfully deprived him of his constitutional right to be free from unreasonable force, resulting in bodily injury.

43. The indictment further charged that on or about December 30, 2017, Anthony Doyle Franklin Bean, acting under color of law as a Sergeant of the Grundy County Sheriff's Office, assaulted the handcuffed arrestee F.M., resulting in bodily injury.

44. The indictment also charged that on or about August 10, 2014, Anthony Glenn Bean, acting under color of law as Chief of the Tracy City Police Department, assaulted arrestee C.G. on two separate occasions, resulting in bodily injury.

45. Following a bench trial held June 16 through June 21, 2021, the Court, (Honorable Travis R. McDonough presiding), issued its verdict on January 28, 2022 and found Anthony Glenn Bean **guilty** of deprivation of rights under color of law in a December 30, 2017 assault on F.M. committed while he was Grundy County Chief Deputy, and on other counts of assaults on C.G.

46. The Court found Anthony Glenn Bean not guilty on one count of the indictment and found Anthony Doyle Franklin Bean not guilty on the sole count against him.

47. The conduct underlying Anthony Glenn Bean's federal convictions — the December 30, 2017 assault on arrestee F.M. — was committed while he held the office of Chief Deputy of the Grundy County Sheriff's Office, the second-highest command position in the agency.

48. Grundy County continued to employ and entrust both Beans with law enforcement authority, including supervisory and command rank, and Grundy County files reflect no departmental discipline arising from the underlying excessive-force conduct; the arrest was reported to the state POST Commission only after the Department of Justice had already charged the deputies.

### D. Deputy David Young's Documented History of Misconduct Known to Grundy County at the Time of Hire.

49. Grundy County swore in David Andrew Young as a deputy sheriff on April 17, 2024, after completing his background investigation on April 10, 2024.

50. Before joining Grundy County, Young had been employed by the Coffee County Sheriff's Office from approximately August 2016 to April 2023 and by the Tullahoma Police Department ("TPD") from approximately June 8, 2020 to December 15, 2022.

51. Young affirmatively acknowledged in his Grundy County application that he had been *terminated from or asked to leave a place of employment,* writing that he could "explain in Person."

52. In the course of its pre-hire reference checks, the Grundy County Sheriff's Office recorded a **series of grave warnings** from Young's prior employer, the Coffee County Sheriff's Office, including that the agency "[c]ould have charged him with excessive force," that it "[h]ad enough to decertify him," that he had "[a]busive problems towards women," that he "[d]oesn't need to be in Law Enforcement," that he was "[n]ot eligible for rehire," and that he had destroyed

department-issued equipment, including a smashed computer and a destroyed department-issued weapon.

53. Grundy County's reference check with the Tullahoma Police Department likewise recorded a notation of a prior "use of force" by Young.

54. Young's documented disciplinary history at the TPD reflected a recurring pattern of using force against citizens. On May 5, 2022, following an investigation into a domestic-violence call that resulted in an arrest, the TPD found Young's actions out of line with its General Orders. Young acknowledged that he had previously been counseled "about [his] judgement in responding to citizens under arrest with force" and that he had received a verbal reprimand the prior year for a previous incident.

54. Young was suspended without pay for three shifts and required to complete counseling and a de-escalation training.

55. On April 13, 2021, the TPD issued Young a written reprimand for a March 29, 2021 call in which he used demeaning language toward a complainant in violation of department policy, placing him on 120 days' probation and requiring sensitivity training.

56. On January 4, 2021, the TPD issued Young an oral reprimand for a November 13, 2020 incident in which he pushed a subject and failed to leave the area as he should have, imposing a 60-day probationary period.

57. With these warnings and this disciplinary record before it — including a prior employer's assessment that it could have charged Young with excessive force

and that he was unfit for law enforcement — the Grundy County Sheriff's Office nonetheless hired Young, armed him, and vested him with the authority of a sworn deputy sheriff and clothed him with the rank of sergeant.

**E. Grundy County's Hiring of Former Deputy Alhafiz Ibn Karteron Following His Termination from the Murfreesboro Police Department.**

58. Alhafiz Ibn Karteron is a former deputy of the Grundy County Sheriff's Office.

59. Before that service, Karteron was employed as a law enforcement officer by the Murfreesboro Police Department ("MPD"), located in Rutherford County, Tennessee.

60. MPD Police Chief James K. Durr, after an internal affairs investigation, terminated Karteron for misrepresenting the nature of a criminal conviction during the MPD hiring process.

> 61[a]. Additionally, the MPD internal affairs investigation discovered Karteron was the subject of an undisclosed order of protection obtained by Brittany Shelton that arose from an investigation of Shelton and Karteron by Middle Tennessee State University Police for possessing a firearm on university grounds.

61. Although Karteron had disclosed that he was charged with simple assault and that the charge had been expunged, MPD's investigation revealed that the original charge was aggravated assault, a Class C felony; that

MPD's investigation further determined that the aggravated assault victim required helicopter medical evacuation to Vanderbilt Hospital, and that Karteron

had not disclosed his aggravated assault arrest on his MPD application, instead representing that he had never been arrested for any violation of law since the age of 18.

62. Chief Durr advised Karteron that, had the information been fully disclosed during the hiring process, MPD would not have offered him a conditional letter of employment, would have been required to obtain a pre-employment waiver from the POST Commission, and that, due to the nature of the incident, had they known this information, they would not have applied for a waiver. Durr decommissioned Karteron from his position as a law enforcement officer with MPD.

63. Notwithstanding Karteron's termination and decommissioning by the Murfreesboro Police Department for concealing a violent felony arrest and conviction on lesser included offenses (that resulted in a jail sentence that included service of 90 days in jail), Karteron thereafter served as a deputy of the Grundy County Sheriff's Office. *To be sure, former Sheriff Schrum was fully aware of Karteron's issues and yet hired Karteron.*

### F. Young's Participation, Weeks After His Hire, in the *Fatal* Use of Force Against Ronnie Ledbetter

64. Within weeks of being sworn as a Grundy County deputy, Young participated in a use-of-force incident that is the subject of a pending federal civil rights action in this same Court. On May 29, 2024, Ronnie Glenn Ledbetter died following an encounter with GCSO's personnel.

65. The surviving children and next of kin of Ronnie Glenn Ledbetter have sued Grundy County and five Grundy County Sheriff's Department officers —

Justin Graham, Jayven Bess, Kenneth Nunley, Brandon King, and David Young — along with a Grundy County Jail correctional officer, in the United States District Court for the Eastern District of Tennessee, styled *Baltimore, et al. v. Grundy County, Tennessee, et al.*, No. 1:25-cv-00174-TRM-CHS, under 42 U.S.C. § 1983.

66. The Ledbetter First Amended Complaint, filed September 23, 2025, alleges that David Young, acting under color of state law as a Grundy County deputy, arrived on scene, helped move the handcuffed and incapacitated Mr. Ledbetter between patrol vehicles, and both witnessed and continued an assault on Mr. Ledbetter, who was tased multiple times and denied medical care.

67. That complaint alleges that Mr. Ledbetter was transported to the Grundy County Jail — by Brandon King, followed by Young — rather than to an emergency room, and that he died after sustaining multiple beatings, being held in a position that deprived him of oxygen, being tased multiple times, and being denied lifesaving medical care, with injuries including dozens of lacerations, severe contusions, *and twelve broken ribs*, the same number of broken ribs the Plaintiff suffered at the hands of Holt and Young.

68. The Ledbetter action names Young as a defendant for both excessive force and failure to protect and alleges that the violence against Mr. Ledbetter was "carried out as a routine practice of the Grundy County Sheriff's Department, and consistent with the training and supervision by Sheriff Heath Gunter."

69. The allegations in the Ledbetter action are unproven and are denied by the defendants; they are presented here as evidence that, within weeks of placing

Young on patrol despite its knowledge of his history, Grundy County's retention of Young became the subject of a second federal excessive-force suit in this District.

70. Despite Young's history as stated in §D and this section, the County promoted Young to the rank of sergeant.

**FACTS - YOUNG AND HOLT'S ENCOUNTER WITH PLAINTIFF**

71. On February 23, 2026 at about 5:25 pm in the area of SR-56 and Old SR-56, Altamont, Tennessee, Young and Holt encountered Plaintiff whom Young described over the radio as "*kinda* in the middle of the roadway waving a stick around"; Congdon was in fact holding a small plastic pipe and was on the side of the roadway after crossing the road.

72. Plaintiff was known to Young and GCSO law enforcement as suffering from mental illness.

73. GCSO policy on handling mentally ill persons includes but is not limited to requiring deputies to act in a non-threatening manner and to avoid using force unless the subject becomes violent towards deputies.

74. Plaintiff repeatedly and calmly asked the deputies to articulate what crime he had committed. Young loudly responded only that "You're in the middle of the road! That's a crime," and told Plaintiff, "How about you go home or you go to jail, which one do you want to do?" At the time of this encounter, Plaintiff was not in the middle of the main roadway, and he, Holt and Young were standing on the pavement of a driveway.

75. Plaintiff, who stated that he lived "right there" across the roadway, asked Young to "back up" and also said "I'll walk, I'll walk." Young then declared, "No you're getting in the truck and we're taking you home," Plaintiff responded, "I have that right," and took a step back as Young walked up to Plaintiff in a menacing and intimidating manner and came within inches of Plaintiff and pointed his left finger at Plaintiff as Young continued to tell Plaintiff to get into "the truck" or go to jail.

76. As Young reached for Plaintiff and Plaintiff ducked away and stepped back, Young (a much larger man than Plaintiff), without any lawful justification, tackled Plaintiff to the ground landing hard with Young on top of him, and Young immediately punched Plaintiff twice in the head. Holt, who had followed but made no contact, exclaimed, "Holy shit. David!"

77. Young rolled Plaintiff onto his stomach and **placed his knee in Plaintiff's back** while the deputies searched his pockets; Plaintiff lay face down, moaning and mumbling incoherently, and repeating, "I'm not going to fight …I just want to go home."

78. Young told Plaintiff, "You wasted …the one opportunity you had to go home," and later, "I tried to be gentle with you at first but you make me want to fight somebody."

79. Blood appeared on Young's right forearm; Young asked aloud, "What did I cut myself on?," radioed Central to "advise the jail we had to fight him," and later told a jail attendant who noticed the blood that it was "[p]robably a thorn

bush." After the encounter, Young remarked to Holt, "Good job," to which Holt laughed, "I didn't do anything."

80. Young charged Plaintiff with resisting arrest and disorderly conduct arising from this encounter. Those charges were dismissed by the state on February 17, 2026.

81. Young drafted a false use of force report wherein he claimed Plaintiff was under the influence. Plaintiff was not under the influence of any alcohol or drug.

82. Young also drafted a false supplemental incident report wherein Young claimed: "Sgt. Young then advised him he could take the ride home, or he would have to arrest him as he posed a danger to himself and the community." However, video from Holt and Young's body-worn camera did not show (prior to Young's assault) that Young ever said anything to Plaintiff about posing a "danger to himself and the community."

83. Upon Plaintiff's release from the Grundy County Jail, his sister Tonya McCarver immediately took Plaintiff to a hospital where he was diagnosed with 12 fractured ribs, the same number of fractured ribs Mr. Ledbetter suffered during his death.

84. Despite the false report by Young and the event recorded on the body-worn cameras of Holt and Young, the County took no action against either Young or Holt.

**THE PATTERN AND PRACTICE: GRUNDY COUNTY'S DELIBERATE INDIFFERENCE AND PRACTICE OF HIRING AND RETAINING DANGEROUS AND UNFIT LAW ENFORCEMENT PERSONNEL**

85. The experiences of Shawn Norris, Anthony Glenn Bean, Anthony Doyle Franklin Bean, Alhafiz Ibn Karteron, and David Andrew Young reflect a consistent and continuing practice by Grundy County of hiring and retaining law enforcement officers who were known, or should have been known, to be dangerous, unqualified, or unfit to exercise the powers of a sworn officer.

86. Grundy County hired and retained Norris notwithstanding a decades-long record of stalking, assault, and sexual-violence allegations and a prior termination, and permitted him to serve — including in and around the county's schools alongside other non-certified officers — until outside authorities forced the issue.

87. Grundy County entrusted command and supervisory authority to Anthony Glenn Bean and Anthony Doyle Franklin Bean, one of whom was ultimately convicted in federal court of violating citizens' civil rights through the use of unreasonable force while serving as the County's Chief Deputy, without the County itself imposing discipline for that conduct.

88. The County likewise took Karteron into its ranks after another Tennessee law enforcement agency had terminated and decommissioned him for concealing a conviction that arose from a violent felony, mirroring the County's treatment of Norris, whom it hired despite a comparable history of violence and deception.

89. The County then hired and promoted Young to serve as a sworn deputy (with the rank of sergeant) and with direct knowledge, obtained through its own background investigation, that a prior law enforcement employer believed it could have charged him with excessive force, deemed him abusive and unfit for law enforcement, and would not rehire him, and that he had been repeatedly disciplined for his use of force and conduct toward citizens.

90. Having placed Young on patrol despite that knowledge, the County saw him participate — within weeks — in the use of force that killed Ronnie Ledbetter, and then abuse Plaintiff Edwin Congdon, confirming the very risk the County had been warned of before it hired him.

91. Despite having undisputed video evidence of the incident with the Plaintiff and the false reports by Young, the County took no disciplinary action against Young or Holt

92. Through this pattern and practice of deficient hiring, inadequate vetting, and failure to supervise or discipline officers known to pose a danger to the public, the County acted with deliberate indifference to the constitutional rights of the citizens its deputies encountered, and set the stage for, and proximately caused, the harm inflicted upon Plaintiff by Young and Holt.

93. Based upon all of the facts stated herein, Grundy County's policymakers had actual or constructive notice of this pattern of excessive force and of the hiring and retention of unfit officers, and were deliberately indifferent to it.

## **CAUSES OF ACTION**

**COUNT I — 42 U.S.C. § 1983: Excessive Force in Violation of the Fourth Amendment (Against Defendant Young)**

94. Plaintiff re-alleges and incorporates by reference each preceding paragraph.

95. The Fourth Amendment, applied to the States through the Fourteenth Amendment, guarantees the right to be free from objectively unreasonable force by a law enforcement officer, and freedom from excessive force in an arrest is clearly established.

96. Acting under color of state law, Young used objectively unreasonable and excessive force against Plaintiff by tackling him, striking him twice, and forcibly restraining him when Plaintiff posed no threat and offered no active resistance. No reasonable law enforcement officer would have acted in such a manner.

97. As a direct and proximate result, Plaintiff suffered physical injury, pain, emotional distress, and other damages to be proven at trial.

**COUNT II — 42 U.S.C. § 1983: Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments (Against Defendant Young)**

98. Plaintiff re-alleges and incorporates by reference each preceding paragraph.

99. The Fourth Amendment, applied to the States through the Fourteenth Amendment, guarantees the right to be free from malicious prosecution by a law enforcement officer, and freedom from malicious prosecution is clearly established.

100. Acting under color of state law, Young falsely and with malice prosecuted Plaintiff. The State of Tennessee dismissed the charges of resisting arrest and disorderly conduct.

101. As a direct and proximate result, Plaintiff suffered physical injury, pain, emotional distress, loss of liberty and other damages to be proven at trial.

**COUNT III — 42 U.S.C. § 1983: Unlawful Seizure and False Arrest Without Probable Cause in Violation of the Fourth Amendment (Against Defendant Young)**

102. Plaintiff re-alleges and incorporates by reference each preceding paragraph.

103. Acting under color of state law, Young seized and arrested Plaintiff without probable cause to believe he had committed any offense, articulating only that Plaintiff was "in the middle of the road."

104. The charges Young caused to be brought were subsequently dismissed.

105. As a direct and proximate result, Plaintiff suffered a loss of liberty, physical injury, emotional distress, and other damages to be proven at trial.

**COUNT IV — 42 U.S.C. § 1983: Failure to Intervene in Violation of the Fourth Amendment (Against Defendant Holt)**

106. Plaintiff re-alleges and incorporates by reference each preceding paragraph.

107. An officer who observes, or has reason to know, that excessive force is being used by a fellow officer, and who has both the opportunity and the means to prevent the harm, is liable under the Fourth Amendment for failing to intervene.

108. Acting under color of state law, Holt observed Young's continued use of force against Plaintiff — including the sustained restraint of Plaintiff in a prone position while he lay subdued and pleading — and had both the opportunity and the means to intervene to stop it, yet failed to do so. Additionally, Holt did not report Young's misconduct to any command level employees of the GCSO or the County despite having the duty to do so.

109. As a direct and proximate result, Plaintiff suffered injury, pain, emotional distress, and other damages to be proven at trial.

**COUNT V — 42 U.S.C. § 1983: Municipal Liability (Monell) — Inadequate Hiring and Custom of Tolerance (Against Grundy County)**

110. Plaintiff re-alleges and incorporates by reference each preceding paragraph.

111. A municipality is liable under § 1983 where its policy or custom is the moving force behind a constitutional violation, including through inadequate hiring and a custom of tolerance or acquiescence to federal rights violations.

112. The County's decision to hire Young, with direct knowledge that a prior employer believed it could have charged him with excessive force and deemed him unfit for law enforcement, reflected deliberate indifference to the plainly obvious consequence that Young was highly likely to inflict the particular injury Plaintiff suffered.

113. The County further maintained a clear and persistent custom of hiring and retaining officers known to be dangerous, unqualified, or prone to excessive

force, and of failing to discipline them, of which its policymakers had notice and to which they were deliberately indifferent.

114. The County's inadequate hiring and its custom of tolerance were each a moving force and direct cause of the violation of Plaintiff's constitutional rights.

115. As a direct and proximate result, Plaintiff suffered the injuries and damages alleged herein.

**COUNT VI — 42 U.S.C. § 1983: Municipal Liability (Canton) — Failure to Train and Supervise (Against Grundy County)**

116. Plaintiff re-alleges and incorporates by reference each preceding paragraph.

117. A municipality is liable under § 1983 where its failure to train or supervise its officers amounts to deliberate indifference to the rights of persons with whom the officers come into contact and causes the constitutional injury.

118. The County failed to adequately train and supervise its deputies, including Young and Holt, in the reasonable use of force during arrests and in the duty to intervene to prevent a fellow officer's use of excessive force and to report a fellow officers misconduct, and that failure resulted from the County's deliberate indifference and caused Plaintiff's injuries.

119. As a direct and proximate result, Plaintiff suffered the injuries and damages alleged herein.

**COUNT VII — Tennessee Code Annotated § 8-8-302: County Liability for the Acts of a Deputy Acting Under Color of Office (Against Grundy County)**

120. Plaintiff re-alleges and incorporates by reference each preceding paragraph.

121. Tennessee Code Annotated § 8-8-302 permits any person injured by the act of a deputy appointed by the sheriff to sue the county in which the sheriff serves, provided the deputy was, at the time, acting by virtue of or under color of the office, and the County's governmental immunity is waived for that purpose.

122. At the time Defendant Young seized, tackled, struck, and restrained Plaintiff, he was a deputy appointed by the Grundy County Sheriff acting by virtue of and under color of his office.

123. As a direct and proximate result of Defendant Young's wrongful acts committed under color of office, Plaintiff suffered injury and damages for which the County is liable under § 8-8-302, subject to the statutory limit of the sheriff's surety bond.

**COUNT VIII — Assault and Battery (Against Defendant Young)**

124. Plaintiff re-alleges and incorporates by reference each preceding paragraph.

125. Defendant Young intentionally caused harmful and offensive contact with Plaintiff, without consent or legal justification, by tackling him, striking him twice, and forcibly restraining him.

126. As a direct and proximate result, Plaintiff suffered physical injury, pain, and emotional distress, and is entitled to compensatory and punitive damages to be proven at trial.

## RELIEF REQUESTED

WHEREFORE, the Plaintiff requests relief as follows:

1) An award of nominal, compensatory, and presumed damages for each violation of Plaintiff's constitutional rights and for violations of state law in the amount of FIVE HUNDRED THOUSAND DOLLARS and to award these damages against all three defendants both joint and severable.

2) An award of punitive damages against the individual defendants Young and Holt in the amount of ONE MILLION DOLLARS and to award the damages against these defendants both joint and severable.

3) Award Plaintiff his attorney and expert witness fees and all other costs of litigation pursuant to 42 U.S.C. §1988 against all defendants, and under other applicable law;

4) Pre-judgment and post judgment interest;

5) The right to conform the pleadings to the proof and evidence presented at trial; and

6) Such other relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to FED. R. CIV. P., Rule 38(b) on all issues so triable.

Respectfully submitted,

[attorney electronic signature on next page]

By: /s/ *Robin Ruben Flores*
**ROBIN RUBEN FLORES**
**TENN. BPR #20751**
**GA. STATE BAR #200745**
Attorney for Plaintiff
4110-A Brainerd Road
Chattanooga, TN 37411
O: (423) 267-1575
F: (423) 267-2703
**robin@robinfloreslaw.com**